Filed 1/3/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ROGER JOHNSON, Individually and as Trustee, etc. et al., | F078173 |
| Plaintiffs, Cross-defendants and Appellants, | (Super. Ct. No. 2006487) |
| v. | **OPINION** |
| LITTLE ROCK RANCH, LLC, | |
| Defendant, Cross-complainant and Respondent; | |
| PREMIER VALLEY, INC., | |
| Cross-complainant, Cross-defendant and Respondent; | |
| ALBERT ROEN et al., | |
| Cross-defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Timothy W. Salter, Judge.

Michael J.F. Smith and John L. Migliazzo, for Plaintiffs, Cross-defendants and Appellants.

Law Offices of Mayol & Barringer, Bart Barringer, for Defendant, Cross-complainant, and Respondent.

**SEE DISSENTING OPINION**

Fores Macko Johnston, Cory B. Chartrand, for Cross-complainant, Cross-defendant, and Respondent.

Thompson Welch Soroko & Gilbert, Darin T. Judd, for Cross-defendants and Respondents.

-ooOoo-

Little Rock Ranch, LLC, the defendant in this matter, bought 677 acres of land in 2012, for the purpose of developing a walnut orchard. The plaintiffs, the Johnson family, own a 210-acre property adjacent to, and to the south of, the property acquired by Little Rock Ranch. The Johnsons filed the instant lawsuit in 2014, alleging that Little Rock Ranch, which had proceeded to develop and plant an irrigated walnut orchard, was trespassing on 3.44 acres of the Johnsons' property. The Johnsons alleged Little Rock Ranch's walnut orchard encroached on their property's northern edge, specifically on a 3.44-acre strip adjoining Little Rock Ranch's property. The Johnsons alleged that Little Rock Ranch had excavated a hillside, leveled land, planted walnut trees, and laid irrigation and sprinkler systems on the disputed strip. The Johnsons sought injunctive relief to end the encroachment and restore the hillside strip to its original condition, among other remedies.

After a bench trial, the trial court found Little Rock Ranch was trespassing by encroachment on the Johnsons' property. However, applying the defense of laches and the "relative hardship" doctrine, the court denied the injunctive relief sought by the Johnsons. The court fashioned an alternative equitable remedy: Little Rock Ranch was required to pay damages to the Johnsons and undertake corrective action to limit erosion of the now-excavated hillside, while the Johnsons were required to deed the strip of land at issue to Little Rock Ranch. In a parallel analysis, the trial court found the trespass by Little Rock Ranch was permanent such that the appropriate measure of damages was "diminution in value" damages, rather than other alternative measures. The Johnsons challenge the trial court's ruling in multiple respects. We affirm.

2.

## FACTS AND PROCEDURAL BACKGROUND

This case is about a dispute over the boundary between two adjoining parcels of land in Waterford, in the vicinity of Highway 132 and Tim Bell Road, that ripened into a lawsuit following the sale, in February or March 2012, of one of the parcels. The parcels of land are in a north-south configuration; the northern parcel is accessed from Tim Bell Road, while the southern parcel is accessible from Highway 132. The northern parcel is 677 acres, and the southern parcel is 210 acres. A relatively straight barbed-wire fence, which has existed for over half a century at least (possibly even over a century), physically separates the two parcels. However, the actual property line lies about 50 feet to the north of the fence, such that the fence in fact cuts across a northern segment of the southern parcel. The strip of land between the fence and the actual property line to the north constitutes 3.44 acres, effectively sandwiched between the far larger parcels on either side.[1] The northern parcel was sold in 2012 to Little Rock Ranch, LLC (Little Rock Ranch or Little Rock). Prior to the sale, both parcels were owned, for decades, by members of the same extended family.

Prior to its sale in 2012, the northern parcel had been owned by Albert and Betty Roen since 1974. At an earlier point, the northern parcel was owned by Albert Roen's grandfather, who also owned the southern parcel. The southern parcel eventually came to be held, in the 1960s, by the Johnson family, specifically LaVerne Johnson, who was a first cousin of Albert Roen. LaVerne Johnson placed her land, i.e., the southern parcel, in a family trust in 1992. The Johnson family—specifically, three of LaVerne Johnson's children (Roger Johnson, Ellen Ratzlaff, and Gary Johnson) and the Johnson Family 1992

---

[1]    The parties had initially stipulated that the strip of land between the fence and the property line amounted to 3.1 acres. However, following trial and before entry of judgment it was determined, based upon a survey, that the disputed strip consisted of 3.44 acres of land. The judgment reflects the true acreage; the survey is attached to the judgment.

Trust—initiated the instant lawsuit (we will refer to the Johnson plaintiffs collectively as the Johnson family or the Johnsons). Two of the Johnson plaintiffs, namely Roger Johnson and Gary Johnson, testified at the trial in this matter.

For the many decades that Albert and Betty Roen owned the northern parcel, they used the land mostly for grazing cattle; they had also occasionally farmed grain on it. As for the southern parcel, the Johnsons used it for dry grain farming or cattle grazing. The Johnsons also leased their entire parcel to the Roens at times; the Roens would use the Johnson property for cattle grazing, much as they used their own land. Albert Roen testified that, regardless of whether he was leasing the Johnsons' parcel, he always had access to and used all the land north of the barbed-wire fence for his cattle. Betty Roen testified that she "knew the fences were not on the [property] line," but did not "per se" know the Roens were using the Johnsons' land in grazing their cattle up to the barbed-wire fence.

The Johnsons eventually leased, in 1997, their parcel to an almond farmer, who planted an almond orchard on the land south of the barbed-wire fence. The strip of land between the fence and the property line to the north remained an unirrigated and unfarmed strip. The land in the strip was sloping; the fence ran along the crest and the land sloped down towards the property line to the north. A dirt road serving the almond orchard ran along the south side of the fence, on the Johnsons' property. The almond farmer had a 20-year lease on the Johnson parcel, and had the option to renew the lease for an additional five years. The Johnsons only occasionally visited their land parcel; they did not use the strip north of the barbed-wire fence for any purpose other than shooting squirrels or rodents on a few occasions.

The Johnsons were aware the Roens had made efforts to sell their parcel over the years; they were aware the property was for sale before Little Rock Ranch bought it. In fact, some 18 months before the Roens finally sold their parcel in 2012, LaVerne Johnson had called Albert Roen and told him the fence ostensibly separating their parcels did not

4.

properly align with the property line. Albert Roen told LaVerne Johnson to commission a survey and to move the fence if and as required. Albert Roen did not hear back from any of the Johnsons in this regard. Albert Roen did not mention the phone call from LaVerne Johnson when he subsequently sold his property to Little Rock Ranch; he said it "slipped [his] mind." The Johnsons, for their part, did not do anything about moving the fence.

The events leading to the sale of the Roen property to Little Rock Ranch took place in the fall of 2011, when the Roens ran into a local real estate agent named Jim Booth, whom they had known for approximately 50 years. Albert Roen told Booth that his property on Tim Bell Road was in escrow but was in danger of falling out of escrow. Booth subsequently contacted Roen and determined the property had fallen out of escrow. Booth eventually found a buyer for the Roen property. The buyer, Little Rock Ranch, was represented by its principal, Raymond Brian Greer.

Booth had passed away by the time of trial; however, his deposition testimony was admitted at trial; Greer testified at trial. In connection with Little Rock's purchase of the Roen property, Booth went to see the property; he met up with Albert Roen there. As Albert Roen and Booth looked out over the property from a knoll, a canal as well as the barbed-wire fence could be seen crossing the property. Booth asked Albert Roen whether the canal marked the property line; Albert Roen answered the fence marked the property line. Booth in turn told Greer that the fence marked the property's southern boundary (both Booth and Greer testified to this effect). Booth testified he informed Greer that the fence marked the property's boundary because that is what Albert Roen had confirmed to Booth. Booth further testified that Albert Roen never told Booth he was using a part of his neighbors' property. Albert and Betty Roen both testified at trial; their respective testimony differed in various respects from Booth's testimony.

Greer began the process of purchasing the Roen property for Little Rock Ranch in late 2011. During the process, various documents were generated. Booth ended up

5.

representing both sides to the transaction, i.e., the Roens as the sellers, and Little Rock Ranch (via Greer) as the buyer. The Roens provided sellers' disclosures, including a sellers' vacant land questionnaire, which was completed and signed by the Roens under penalty of perjury. One of the questions on the questionnaire was whether the sellers were using any neighboring property; the Roens answered this question in the negative. At trial, the Roens testified they answered these questions in the negative at Booth's direction; however, in his deposition Booth denied directing the Roens to provide false information in the questionnaire. Greer, for his part, could not recall whether he saw this document prior to close of escrow on the property, although Booth maintained he provided it to Greer upon its completion by the Roens.

Another document generated for purposes of the transaction was a preliminary title report. The report noted that "the fence line encroaches onto adjoining land in multiple areas," but did not specify the extent of divergence between the fence lines and property lines. The preliminary title report referenced a survey of the property conducted in 2008 as the basis for its conclusion. The survey, which mapped the divergence between the property line and fence line, was not attached to the report. Greer received and signed off on the preliminary title report but did not delve into it deeply; he did not receive or obtain a copy of the 2008 survey referenced in the report. Greer understood, based on a conversation he had previously had with Booth, that while there was a potential, in the case of large agricultural properties, for minor discrepancies between property lines and fence lines, any such discrepancies would be de minimis, that is, limited to a foot or two and to some spots.

The purchase price for the Roen property was ultimately discounted by $46,000, based on the terms of the purchase contract, on account of the discovery on the property of areas that were susceptible to collecting standing water, and were therefore not considered suitable, in their undeveloped condition, for farming. Although it initially

appeared 62 acres of the property were affected, including so-called buffer zones, in the end 30.78 acres were determined to be nonfarmable wetlands.

Greer took possession of the Roen property on March 1, 2012. He immediately set about preparing a walnut orchard on the entire parcel, operating on his understanding that the southern boundary of his property ran along the barbed-wire fence, beyond which lay the neighboring farmer's almond orchard. Right around the time escrow closed, Greer ordered thousands of trees for his orchard. The trees were "special bud trees"; it typically took a long time to generate the requisite "rootstock" and obtain the "special bud wood," and to complete the grafting process. The entire process could consume two years. Between March 1, 2012, and May 1, 2012, Greer had the southern 130 acres of the property graded, rendering all of it farmable. Dirt was moved and leveled in various parts of the property, including in the area immediately to the north of the barbed-wire fence. The downslope extending northwards from the fence line was excavated and leveled; the excavated soil was moved to other parts of the property. The rest of the property was graded by "October/November" 2012. Greer also had an irrigation and sprinkler system planned and designed.

In December 2012, Greer received a letter from an attorney representing the Johnsons. The letter stated that the fence line was not the true boundary between the Roen and Johnson parcels; rather, the boundary lay 45 feet from the fence line. Greer did not understand what the letter was talking about, as Booth had told him the barbed-wire fence marked the southern boundary of the Roen property. Thus began a long process of investigation on Greer's part regarding the merits of the Johnsons' boundary claim. Greer tried to ascertain how he reasonably could proceed, given he had preordered all the trees for the orchard, the irrigation system design was already completed, and costly excavation and leveling work had been done, all on the assumption his property extended to the fence line.

In March 2013, the Johnsons' attorney provided Greer with a survey from 1950 that showed the boundary between the Roen and Johnson parcels was approximately 50 feet north of the barbed-wire fence. Greer noted: "At that point I realized, okay, we've got an issue here with lot lines and fence lines, but that's not what was represented to me when we bought the property." Greer summed up the situation: "We were still in the investigative mode, and the trees were ordered. They were special bud trees. They were in the nursery. Pipelines had been designed. Systems calibrated. The bulk of the expense was moving the dirt; that had already occurred."

Greer and Booth met with the Roens at a restaurant in Oakdale to discuss the issue and get more information, in May 2013. Greer testified: "We were still trying to understand how this happened. We didn't know. We weren't … comprehending what the issues were." Booth explained in his deposition that Albert Roen told them for the first time, at the restaurant, that "there was a dispute" with the Johnsons over the boundary between the Roen and Johnson parcels. Greer similarly testified: "Jim [Booth] and I were both surprised to hear what came out of Mr. Roen's mouth." Asked what came out of Albert Roen's mouth, Greer said: "Well, he told us the LaVerne Johnson story about the issue with the fence, and [the Johnsons] wanting to move the fence, and [he] gave them the opportunity to [do a survey and] move [the fence if required,] and [it] didn't happen." Eventually, a surveyor who was doing some other work for Greer showed him a map that "further corroborated the 1950 survey" sent by the Johnsons' lawyer.

Greer continued to try to resolve the situation with the Johnsons, even offering to buy the disputed land, without success. Greer ended up installing the irrigation and sprinkler systems for the property as, like the trees, these systems had been previously ordered and paid for. Also, when the preordered, special-variety walnut trees were delivered, Greer planted them, including in the disputed strip, because the trees must be planted quickly; they cannot "sit in cold storage." Greer testified the trees were not

marketable; they were a specially-ordered variety that was unique to Little Rock Ranch's orchards and did not move on the market. Approximately 400 trees were planted in the disputed strip, in keeping with the plan for the overall orchard. At the time of trial in 2016, the trees were 15-18 feet tall; they would eventually become 30 feet tall, with diameters ranging from 20 to 23 feet. The trees cost $22 each and the cost of planting was $2 or $3 per tree. On the perimeter of the orchard, Greer planted so-called soldier rows to serve as "foliar barrier[s]." A soldier row is a closely packed row of trees that operates as a buffer against neighboring fields that are planted with other types of trees, and on which different products are used.

Greer incurred substantial costs in developing his orchard. The tractor and dirt work in preparing the land cost approximately $1.3 million. Four wells were constructed—none on the disputed strip—at a cost of approximately $1 million. The irrigation and sprinkler system design and installation cost $1200-$1300 per acre, for 677 acres. Two bridges were constructed for a cost of $160,000. And the main entrance and truck turnaround were constructed for a cost of $350,000.

At trial, Albert Roen testified that a family member had long ago marked the boundary between the Roen and Johnson parcels with a post attached to a vehicle frame. Gary Johnson (around 60 years old at the time of trial) and Roger Johnson (45 years old at the time of trial) both testified they had known since they were young children that the fence did not coincide with the boundary between the Johnson and Roen parcels; rather, the boundary was demarcated by a post attached to a vehicle frame. However, neither Booth, nor Greer, saw such a post on the property at any time. Booth testified Albert Roen never mentioned a post attached to a car chassis to him.

Gary Johnson and Roger Johnson acknowledged that neither they, nor their parents, ever took any action to relocate the fence to the boundary line, despite their longstanding knowledge of the discrepancy between the two. Gary Johnson and Roger Johnson testified that Greer's excavation work in the disputed strip had made the fence

line along the crest of the slope therein, susceptible to erosion. The Johnsons suggested the slope had been rendered more like a cliff or embankment, which raised concerns that a service road alongside, and to the south of, the fence would be undermined over time by erosion.

The Johnsons initiated the present matter on February 28, 2014, suing Little Rock Ranch to quiet title to the disputed strip and for trespass, conversion, and injunctive relief, among other claims. Little Rock Ranch cross-complained against the Johnsons seeking to quiet title to the disputed strip based on adverse possession. Little Rock Ranch also cross-complained against the Roens for intentional misrepresentation and indemnity, and against Premier Valley, Inc., dba Century 21 M&M and Associates, Little Rock Ranch's real estate broker, for breach of fiduciary duty, negligent misrepresentation, and indemnity (Jim Booth worked at Century 21 M&M and Associates in Turlock). The matter proceeded to bench trial from October 25, 2016, to November 1, 2016. The trial court issued a final statement of decision on August 3, 2017, and judgment was eventually entered on July 3, 2018.

### A.      *The Trial Court's Statement of Decision*

The trial court issued a detailed 43-page statement of decision, laying out the evidence adduced at trial as well as the court's findings of fact and legal conclusions. We will delineate below the trial court's comments on the evidence, its findings of fact, and its legal conclusions, to the extent pertinent to the issues on appeal.

The court described the evidence adduced at trial under the following headings: "The Disputed Property"; "Sale of the Northern Property"; and "Post-Sale Actions." With regard to "The Disputed Property," the court noted:

> "The disputed property is approximately [3.44] acres, a fifty-foot strip of land, more or less, that lies between an old fence line and the actual property line to the north. The disputed property actually lies on Plaintiffs' property, the southern parcel. There was evidence that the Johnson family let Mr. Roen use that land for 38 years, free of charge. Also, the Johnsons

10.

did nothing for over 50 years to move the fence and establish [their] rights. Even after the Johnson family knew that the Roens were selling their property or had a sale pending, the Johnson family did nothing until well after the close of escrow. In other words, the fence between the Johnson and Roen property was in the same place for at least 50 years and the Johnson family did nothing to correct the fence line until after Mr. Greer had moved significant amounts of dirt. The fences have probably been in the same location since the early 1900s [citation]; Mr. Roen had been using that 50 feet or so of the Johnsons' property since 1974, even when he was not leasing Johnson property [citation]; from 1974, until he sold the property, Mr. Roen occasionally used that 50 feet of Johnson property as his own and grazed cattle on it. There was never an objection from the Johnsons."

Next, in its summary of the evidence, regarding "Sale of the Northern Property," the court noted: "There are significant disputes in the testimony of the parties concerning the circumstances leading up to the sale of the property." The court described discrepancies between, on the one hand, the testimony provided by the Roens at trial, and, on the other hand, the testimony given by real estate agent Jim Booth at his deposition. As discussed further below, the court ultimately credited Booth's testimony and found that "Mr. Roen told Mr. Booth that [the Roen] property went [all the way] to the fence to the south." The court also ultimately found that when Booth subsequently took Greer to look at the Roen property, Booth, in turn, told Greer "that the southern boundary [of the Roen property] was at the fence line."

The court also addressed, in its summary of the evidence, what it termed "Post-Sale Actions." In this regard, the court noted:

"[Raymond] Brian Greer testified that Little Rock first began leveling and grading the Disputed Property in March 2012 and that it completed [dirt] work on the disputed property by May 2012. [Greer] further testified that Plaintiffs did not notify Little Rock that it was using [the Johnson] property at any time while the work was being done on the disputed property [citation] and did not notify Little Rock of any dispute until Plaintiffs' attorney, Ronald Hillberg[,] wrote Little Rock a letter on November 30, 2012, [citation][,] some six (6) months after Little Rock had completed the grading work on the disputed property.

11.

"Little Rock has invested significant sums of money on the development of the Property into a walnut orchard, including the disputed property. Little Rock testified that it invested approximately $1.3 million in tractor and dirt work on the property [citation]; $1 million in wells [on the] Property [citation]; $160,000 in two bridges [citation]; $350,000 at the main entrance; $871,000 in design and installation of the irrigation system [citation] and $11,000 in trees specifically planted on the disputed property [citation] and $1,500 in planting [the] trees on the disputed property [citation] alone. Plaintiffs did nothing while the disputed property was being graded and did nothing for six months after completion of the grading and dirt work and after Little Rock had designed irrigation systems on the disputed property and ordered the trees for the disputed property. [Citation.] During the 8 to 9 months that Plaintiffs failed to notice the development work of Little Rock, it spent, in addition to the $12,500 on trees and their planting, $7,445 on dirt moving (1.3M/681 x 3.9),[2] $5,726 on wells supplying water to the disputed area (1M/681 x 3.9),[3] which equals $25, 671.

"When the Johnsons discovered that Little Rock had excavated their hillside, they attempted to contact Little Rock. [Citation.] In December 2012, Little Rock received Mr. Hillberg's letter, on their behalf, demanding that the property be restored. [Citation.] Mr. Greer testified that he 'was completely floored' when he got the letter. [Citation.] [Mr. Greer's attorney] responded with a letter, stating in part: "By the time Little Rock received your letter, it had already gone through the extent of preparing and levelling the land, and ordered and paid for trees, irrigation systems, engineering, and other items to plant right up to the fence line. [Citation.] [¶] Little Rock had not yet planted its trees, and the irrigation system had not yet been installed."

The court went on to make multiple findings of fact, none of which are challenged on appeal, by any party. The court made the following findings of fact (listed in order):

- "Plaintiffs Roger Johnson and Ellen Ratzlaff are the trustees of the Johnson Family Trust of 1992."

---

**2** The court's calculations assumed the disputed property amounted to 3.9 acres (based on counsel inadvertently using that figure at trial); as noted, it was subsequently determined the disputed property amounted to 3.44 acres (see footnote 1, *ante*).

**3** See footnote 2, *ante*.

- "The Johnson Trust owns approximately 220 acres of land, east of Waterford, CA, and north of SR 132. Most of the property is planted in almond trees, which at the time of trial, were approximately 19 years old."

- "The northern boundary of Plaintiff's property was unmarked, other than with some iron pipes, buried at the Northwest corner and the Northeast corner. At some point there was apparently a post, with a vehicle chassis on top that was located near the Northwest corner."

- "There was also a fence, running east and west, which was located approximately 50 feet south of the northern boundary of Plaintiff's property. It is unknown exactly when this fence was built, but it was built as recently as the 1950's or 1960's. It may have been present since the early 1900's."

- "Plaintiffs' property has been in the family for four generations, and was first acquired by their great grandfather. In the earlier years, Plaintiffs or their relatives used the property to grow grain or raise cattle."

- "The Johnson property on the north side of the fence was not used much. In the winter water would accumulate and pool there. In the summer, the Johnsons would occasionally hunt there, and sometimes throw grain there to 'chum.' Also, occasionally, that land was used for storage of harvester machinery."

- "The property to the north of Plaintiff's land, was a 677 acre parcel. It was acquired by … Albert and Betty Roen in 1974, after renting the property. The Roens used the property for grazing their cattle."

- "In 2012 the Roens met a realtor, Jim Booth. Mr. Booth was an agent with Premier Valley, Inc. The Roens told Mr. Booth that their property was in escrow, but would probably 'fall out.' "

- "A few days later, Mr. Roen told Mr. Booth in a phone conversation that the property had 'fallen out' of escrow, and was for sale."

- "Mr. Booth was introduced to Mr. Greer, who was looking for a large parcel of real estate that could be used for farming."

- "Mr. Booth provided Mr. Greer a plot map of the 677 acres. Mr. Booth was shown the property by Mr. Roen. During this visit, Mr. Roen told Mr. Booth that the property went to the fence to the south."

- "Mr. Greer later looked at the property with Mr. Booth. Mr. Booth told Mr. Greer that the southern boundary was at the fence line."

13.

- "Mr. Greer thereafter made an offer to Mr. and Mrs. Roen, to purchase their property for $8,000 per acre. The offer was later modified, for the price to be reduced by an agreed-upon reduction for approximately 30 acres of vernal pools. Mr. Roen added 'Addendum A' to provide that he was selling 677 acres."

- "Mr. Greer … received and approved the preliminary title report. The report noted 'the fact that the fence line encroaches onto adjoining land in multiple areas.' Reference was made to [a] survey conducted by Associated Engineering, Inc."

- "Mr. Greer did not read the contents of [the preliminary title report]."

- "The escrow closed in either late 2011 or early 2012."

- "On March 1, 2012, after the Roens had removed their cattle from the property, Mr. Greer started conducting earth-moving operations on the property, starting on the north side of the fence in question."

- "The earth-moving operations were completed by May 1, 2012. During the process, Little Rock spent over $25,000 improving the [3.44] acres through ripping, leveling, providing irrigation, and planting approximately 400 walnut trees."

- "Attorney Ronald Hillberg sent Raymond [Brian] Greer a letter dated November 30, 2012, informing Mr. Greer that the defendant had encroached on Plaintiffs' land. This was the first notification defendant received that it had moved dirt belonging to Plaintiffs."

- "The encroachment totals approximately [3.44] acres of land, belonging to Plaintiffs."

- "By the time he had received the letter, Mr. Greer had already ordered and paid for irrigation systems and specially budded walnut trees, including irrigation and trees for the encroached property."

- "Mr. Greer attempted to resolve the dispute by purchasing the land being encroached upon, but was unsuccessful in resolving the matter. Mr. Greer refused to voluntarily vacate the [3.44] acres and move the dirt back, which had been moved."

The trial court also reached and memorialized multiple "[c]onclusions of [l]aw," including the following:

14.

- "Defendant encroached onto approximately [3.44] acres of Plaintiffs' property with earth-moving caterpillar bulldozers in March, 2012, moving perhaps thousands of cubic yards of the soil."

- "Defendant's initial entry onto Plaintiff's property constituted a trespass, and Defendant's continuing occupation of Plaintiffs' property constitutes trespass."

- "Plaintiffs failed to prove that Defendant was guilty of conversion for removing the dirt on the [3.44] acres."

- "Plaintiffs are guilty of laches."

- "The Court has reached the following conclusions: (1) Plaintiffs have made little or no use of the [3.44] acres for periods as long as years; (2) Plaintiffs have largely limited the use of their property to that portion which lies south of the east-west fence; (3) Defendant encroached upon the [3.44] acres on the mistaken belief that it was part of the property that it had purchased; (4) Defendant has expended thousands of dollars as well as a substantial amount of time improving the [3.44] acres, including making it a part of a productive, irrigated walnut orchard; (5) It would be nearly impossible for Defendant to accurately replace the dirt that has been moved around on and away from the [3.44] acres. The Court therefore concludes that the interests of equity and justice would not be served by requiring Defendant to vacate the [3.44] acres and attempt to move the dirt back to its original location next to the fence."

- "The Court also concludes that requiring Defendant to replace the dirt and to vacate the property would constitute economic waste, and would actually diminish the value of the [3.44] acres from $35,000 per acre, to approximately $8,000 per acre."

- "The Court has determined that the value of the [3.44] acres is $136,500, and Defendant should be required to pay this sum to Plaintiffs. Plaintiffs should then be required to deed to Defendant the [3.44] acres. Defendant should pay for the engineering/title work necessary to prepare such a deed."

- "Plaintiffs are entitled to attorney's fees [payable by Defendant]."

- "Defendant is entitled to equitable indemnity from both Mr. and Mrs. Roen as well as Premier Valley, Inc., in the following percentages: as to the Roens, 20%; as to Premier Valley, Inc., 10%. This award of indemnity does not apply to the attorney's fees awarded."

15.

- "Defendant's actions in making 'cuts' next to the east-west fence, has caused erosion. Defendant [shall] be ordered to file with the Court a remedial plan, prepared by a licensed soils engineer or environmental consultant. The Court [shall] reserve jurisdiction over this case to monitor compliance with the plan for remediation."

The court also denied the Johnsons' request for punitive damages, noting: "The Court finds that there is no clear and convincing evidence of malice on the part of Mr. Greer. As previously discussed, he entered Plaintiffs' land under the mistaken impression that the boundary line was the fence line. It was only after six months of earth-moving, and large expenditures for irrigation systems and specially budded trees, that it was discovered that he had encroached on Plaintiffs' land. His decision at that time, to not withdraw from the land, and not to attempt restoration is not viewed as malicious by this Court."

In addition, the court noted that both the Roens and Jim Booth were partially at fault for Greer and Little Rock's understanding that the boundary between the Roen and Johnson properties was demarcated by the barbed-wire fence. In this context, the court observed: "The Court finds that Roen made intentional and obvious misrepresentations pertaining to the [Roen] Property at the time of the sale to Little Rock. Roen claims that these representations are somehow immaterial as Little Rock did not get or review the Sellers [Vacant] Land Questionnaire before the close of escrow. However, it is undisputed that Booth told Little Rock that the fence line was on the boundary line, or close to it, and Little Rock relied on this representation to cultivate and plant the Disputed Property."

The court added: "Booth testified under oath that Roen told him that the fence lines were the property lines and Roen testified he did not do this. Roen testified that he made the intentional misrepresentations on the Sellers Vacant Land Questionnaire at Booth's instruction and Booth testified that he did not instruct Roen how to fill out that form …. [T]he Court finds Booth's testimony on this point to be more credible. The fact

16.

of the matter is that Roen made intentional misrepresentations regarding boundary lines, that Booth represented to Little Rock where the property lines were and that Little Rock relied on those representations and developed the Disputed Property because [it] was within the fence lines." The court also found that Premier Valley incurred liability to the extent Booth did not examine and explain to Greer, the discrepancy between the seller vacant land questionnaire completed by the Roens and the preliminary title report.

The court noted it had made a site visit to the Roen/Little Rock and Johnson properties to observe the area of dispute in person.

The court found that the Johnsons were entitled to attorney's fees under Code of Civil Procedure section 1021.9, which "allows the recovery of attorney's fees '[i]n any action to recover damages to personal or real property resulting from trespassing on lands either under cultivation or intended or used for the raising of livestock.' "

Finally, the court noted that it was "reserving jurisdiction to require Defendant to take remedial actions necessary to correct erosion problems along the location of the fence and adjoining dirt road." The court added: "Defendant will be ordered to present an initial corrective action plan, to be filed with this Court no later than September 1, 2018. The plan must be prepared by a licensed soils engineer or environmental expert/contractor. The Court intends to monitor this situation for at least the next 5 years."

## DISCUSSION

I. **Trial Court Did Not Abuse Its Discretion In Denying Johnsons' Claims for Injunctive Relief Regarding Little Rock's Trespass and Properly Fashioned Equitable Remedy; In Addition, Court Properly Found Little Rock's Trespass Was Permanent and Awarded Appropriate Damages**

The Johnsons, in the civil complaint initiating this action, requested injunctive relief to "[require] Defendant to restore the Subject Property to its condition prior to Defendant's trespass of ripping, removing, and excavating the soil, including replacing the soil, compacting it, and bringing it back to prior elevation levels." The Johnsons'

17.

complaint also requested injunctive relief to "[prevent] Defendant from entering upon or interfering with Plaintiffs' property." Next, the Johnsons sought, in their complaint, to quiet title to the disputed property in their favor, to the extent Little Rock Ranch claimed title thereto based on adverse possession. The complaint further sought "declaratory relief declaring Plaintiffs' ownership and title to the subject property, and clearly establishing the boundary thereof." The Johnsons also sought damages and attorneys' fees.

In its statement of decision, the trial court noted, with regard to the disputed property, that it "assume[d] that Little Rock ha[d] abandoned the theory of adverse possession," and that "[i]n any event, Little Rock ha[d] failed to prove adverse possession." Rather, the trial court found that, in preparing the land, laying an irrigation system, and planting walnut trees, right up to the barbed-wire fence, Little Rock Ranch was "trespassing" on a few acres of the Johnsons' property.

The court addressed the question of remedies for Little Rock Ranch's trespass. The court denied the Johnsons' request for equitable relief in the form of injunctions requiring Little Rock Ranch to end the trespass on the disputed property (between the fence and the true boundary line to the north) and to restore the land to its original state. We review the trial court's decision on granting or denying a permanent injunction for abuse of discretion. (See, e.g., *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390.) We detect no abuse of discretion in the trial court's denial of the injunctive relief sought by the Johnsons.

### *(1)     Court Properly Found Defense of Laches Barred Injunctive Relief*

Preliminarily, the court concluded that the equitable defense of laches applied in this case to bar the equitable remedy of injunctive relief. "Laches may bar equitable relief where the party seeking relief has delayed enforcing a right and there is prejudice arising from the delay." (*Kapner v. Meadowlark Ranch Association* (2004) 116 Cal.App.4th 1182, 1190 (*Kapner*); *Holt v. County of Monterey* (1982) 128 Cal.App.3d

18.

797, 801 [equitable defense of laches applies where "unjustified delay has operated to the injury of another"].) "In determining whether laches apply, the court should weigh the competing equities and grant or deny relief depending on the balance of those equities." (*Kapner*, *supra*, at p. 1190; *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 77 [" 'The telling consideration must be that laches constitutes an affirmative defense *which does not reach the merits of the cause.*' "].)

Here, the court properly noted: "The defense of laches requires unreasonable delay plus either acquiescence in the act about which the Plaintiff complains or prejudice to the defendants resulting from the delay." (See *Johnson v. City of Loma Linda*, *supra*, 24 Cal.4th at p. 77 ["The doctrine of laches bars a cause of action when the plaintiff unreasonably delays in asserting or diligently pursuing the cause and the plaintiff has acquiesced in the act about which the plaintiff complains, or the delay has prejudiced defendant."]; see also *Conti v. Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 360 [" 'It is not so much a question of the lapse of time as it is to determine whether prejudice has resulted. If the delay has caused no material change in *statu quo*, *ante*, i.e., no detriment suffered by the party pleading the laches, his plea is in vain.' "].) The court also correctly set forth the elements of the defense of laches, as follows: "The basic elements of laches are: (1) an omission to assert a right; (2) a delay in the assertion of the right for some appreciable period; and (3) circumstances which would cause prejudice to an adverse party if assertion of the right is permitted." (See *Stafford v. Ballinger* (1962) 199 Cal.App.2d 289, 296.)

The court noted that the Johnsons had taken "no action whatsoever to move the fence to the proper boundary line" over the course of multiple decades, during which time the Roens "freely used the disputed property," while the Johnsons "never used the disputed property for any [significant] purpose of their own." The court further noted that the Johnsons had "delayed" asserting their rights to the disputed property "until well after Little Rock had completed the grading and groundwork of the disputed property."

19.

The court pointed to Greer's testimony to the effect the Johnsons "did not notify Little Rock that it was using [the Johnsons'] property at any time while [this] work was being done on the disputed property" and "did not notify Little Rock of any dispute until Plaintiffs' attorney, Ronald Hillberg, wrote Little Rock a letter on November 30, 2012 … some six (6) months after Little Rock had completed the grading work on the disputed property." The court reemphasized that "Plaintiffs did nothing while the disputed property was being graded and did nothing for six months after completion of the grading and dirt work," waiting until "after Little Rock had designed irrigation systems on the disputed property and ordered the trees for the disputed property."

The court also observed:

"The plaintiffs in this case … were absentee owners who only occasionally visited their property, and then, usually to hunt or shoot at targets. It is of interest to the Court to note that when plaintiffs in this case leased their property for the purpose of farming almonds, neither they nor their lessee farmer, attempted to make any [significant] use of the disputed [3.44] acres. Instead, the farmer who leased their property farmed up to the fence, and no farther. The farmer may have been aware of Little Rock's earth-moving activities after the sale to Little Rock, but the plaintiffs did not discover it for almost 6 months [after completion of the land grading work], during which time defendants were spending serious time and effort to develop their walnut orchard. While six months by itself might not be sufficient to trigger laches, that time, combined with at least 50 years of inaction, is sufficient … for the Court to apply laches. However, laches in this instance does not bar all remedies, only equitable remedies."

In addition, the court found "there was prejudice to Little Rock consisting of the money and time spent on improving the [3.44] acres during the 8 to 9 month interval before Plaintiffs notified Little Rock of the encroachments. By then, Little Rock had already spent nearly 9 months working on the ranch, including [on] the disputed acreage, and [expended] over $25,000 on the disputed acreage." The court noted: "The Court finds this delay brought about detriment and prejudice to Little Rock." The court also found the Johnsons had not furnished an entirely satisfactory explanation as to why they

20.

did not sooner discover and complain about "the radical earth moving being done on their property by Little Rock," given that their land was in use and Little Rock Ranch's activities on the disputed property were out in the open. The court concluded that "Plaintiffs are guilty of laches" and "Plaintiffs' claim for injunctive relief is barred by laches."

"Generally, a trial court's laches ruling will be sustained on appeal if there is substantial evidence to support the ruling." (*Johnson v. City of Loma Linda*, *supra*, 24 Cal.4th at p. 67; see *Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1417 [" 'Generally, speaking, the existence of laches is a question of fact to be determined by the trial court in light of all of the applicable circumstances, and in the absence of manifest injustice or a lack of substantial support in the evidence its determination will be sustained.' "]; cf. *In re Marriage of Fogarty and Rasbeary* (2000) 78 Cal.App.4th 1353, 1364-1365 [stating, with regard to the application of laches, that "the better rule is to review … for abuse of discretion"].)

Here, the problem was not that there was no fence on the boundary line separating the properties. Rather, the problem was that there was an actual fence on the Johnson property *just a short distance* from the boundary line. The Johnsons were long aware that the fence was in the wrong place and that the Roens intended to sell their property. Some 18 months before the eventual sale of the Roen property, LaVerne Johnson contacted Albert Roen and indicated the property line should be accurately determined and the fence moved to coincide with the property line. The Johnsons, however, never took any steps to settle the boundary issue with Roen or to move the fence or to otherwise alleviate the situation. On the contrary, they waited until nine months after escrow closed on the Roen property to bring the boundary issue to the attention of Little Rock Ranch, by which time Little Rock Ranch had already completed major excavation and leveling work, among other improvements, on the disputed property.

We conclude the trial court's application of laches to bar injunctive relief is amply supported by substantial evidence in the record. Furthermore, to the extent the applicable standard of review is abuse of discretion, we detect no such abuse in the trial court's denial of injunctive relief based on the application of laches.

### (2) Court Properly Applied the "Relative Hardship" Doctrine to Deny Injunctive Relief, Compel the Johnsons to Accept Damages, and Craft an Equitable Remedy

#### (a) Applicable Law

The "relative hardship" doctrine is applied by California courts in encroachment cases to determine whether to grant an injunction requiring removal of the encroachment or to resolve the issue by fashioning an alternative, equitable remedy and awarding damages. (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 758 ["California Courts have long applied the relative hardship doctrine in determining whether to grant an injunction to enjoin a trespass by encroachment on another's land."] (*Hirshfield*).) Pursuant to the "relative hardship" doctrine, which involves balancing the equities that bear on the situation at issue, courts have power in equity to create a protective interest in favor of an encroacher. (See *Tashakori v. Lakis* (2011) 196 Cal.App.4th 1003, 1009 ["courts may exercise their equity powers to affirmatively fashion an interest in the owner's land which will protect the encroacher's use"].)

In other words, "[u]nder [the relative hardship] doctrine, once the court determines that a trespass has occurred, the court conducts an equitable balancing to determine whether to grant an injunction prohibiting the trespass or whether to award damages instead." (*Hirshfield, supra*, 91 Cal.App.4th at pp. 758-759, 761 ["Under the relative hardship test, the trial court must identify the competing equities underlying each party's position. It then must balance the relative hardships of granting or denying an injunction to remove encroachments from the plaintiff's property."].) " ' "[W]here the encroachment does not irreparably injure the plaintiff, was innocently made, and where

22.

the cost of removal would be great compared to the inconvenience caused plaintiff by the continuance of the encroachment, the equity court may, in its discretion, deny the injunction and compel the plaintiff to accept damages." ' " (*Salazar v. Matejcek* (2016) 245 Cal.App.4th 634, 649 (*Salazar*); *Hirshfield*, *supra*, 91 Cal.App.4th at p. 761 [an injunction request may be defeated upon a showing of "the substantial hardship the encroacher must endure when balanced against the lesser hardship to the plaintiff"].)

An encroacher's failure to adduce direct evidence of the cost of removing the encroachments in question is not fatal where the trial court viewed the disputed property, as "its observations are evidence which may be used alone or with other evidence to support its findings." (*Hirshfield*, *supra*, 91 Cal.App.4th at p. 762 ["[Where] the court's observations were not reported and are not part of the record on appeal, we must presume that the evidence the court saw was sufficient to support its findings].)[4] The court may also properly consider testimony describing the character of improvements made by the encroacher, and from its inspection and such evidence, infer that the cost of removal would be significant. (*Ibid*.; see *Dolske v. Gormley* (1962) 58 Cal.2d 513, 520 [reviewing court may take judicial notice of the fact that removal of encroaching structures, "as pictured in the exhibits" in the appellate record, "would involve considerable expense"] (*Dolske*).)

*Hirshfield* explained that under the relative hardship doctrine, the court further has broad equitable powers to fashion a remedy to fit the requirements of specific cases. (*Hirshfield, supra*, 91 Cal.App.4th at pp. 765, 770-771 ["the courts are not limited to judicial passivity as in merely refusing to enjoin an encroachment. Instead, in a proper case, the courts may exercise their equity powers to affirmatively fashion an interest in the owner's land which will protect the encroacher's use"]; see *Salazar*, *supra*, 245

---

**4**      Here, the trial court personally viewed the disputed property and, as was the case in *Hirshfield*, its observations are not part of the record on appeal.

Cal.App.4th at p. 648 ["The trial court ha[s] the authority to fashion an equitable remedy appropriate to the circumstances of [each] case. It is well established that a 'court called upon to afford relief historically or analytically equitable in its nature "has broad powers to fashion a remedy. [Citation.] It may create new remedies to deal with novel factual situations." ' "].) As *Hirshfield* explained:

> " ' "It has always been the pride of courts of equity that they will so mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication." [Citation.]' 'The powers of a court of equity, dealing with the subject-matters within its jurisdiction, are not cribbed or confined by the rigid rules of law. From the very nature of equity, a wide play is left to the conscience of the chancellor in formulating his decrees.… It is of the very essence of equity that its powers should be so broad as to be capable of dealing with novel conditions. [Citation.]' Equity acts ' "in order to meet the requirements of every case." ' " (*Hirshfield*, *supra*, 91 Cal.App.4th at pp. 770-771.)

Thus, a trial court may deny "an injunction to remove encroachments" and exercise "its equity powers to grant affirmative relief tailored to protect the encroacher's use of the disputed land." (*Hirshfield*, *supra*, at p. 770.) "[T]he interest created will be affirmed unless it amounts to an abuse of the trial court's discretion." (*Id*. at p. 771.)

### (b) Analysis

" 'The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion. [Citation.] The exercise of discretion must be supported by the evidence and, "to the extent the trial court had to review the evidence to resolve disputed factual issues, and draw inferences from the presented facts, [we] review such factual findings under a substantial evidence standard.' " (*Salazar*, *supra*, 245 Cal.App.4th at p. 647.) "A trial court's discretionary 'ruling "will be sustained on review unless it falls outside the bounds of reason." [Citation.] We could therefore disagree with the trial court's conclusion, but if the trial court's conclusion was a reasonable exercise of its discretion,

24.

we are not free to substitute our discretion for that of the trial court.' " (*Ibid*.; see *Hirshfield*, *supra*, 91 Cal.App.4th at p. 771 [where "the trial court exercised its equity powers when fashioning [an] interest [in favor of an encroacher], we review the judgment under the abuse of discretion standard"]; see also *Husain v. California Pacific Bank* (2021) 61 Cal.App.5th 717, 727-728 [" '[T]he trial court is better equipped than we are to fashion equitable relief and we afford it considerable discretion.' "].)

Here, the trial court effectively applied the "relative hardship doctrine" in denying injunctive relief, awarding damages, and fashioning an alternative equitable remedy to resolve the dispute. Although the trial court did not explicitly state, in its statement of decision, that it was applying the "relative hardship doctrine," the record is clear the court balanced the relative equities implicated by the parties' respective positions in reaching its decision. In other words, the court's analysis and ultimate resolution of the dispute applied the relative hardship doctrine in substance, even if not expressly so. In fact, in subsequently ruling on the Johnsons' motion for new trial, the court explicitly clarified it had applied the "relative hardship doctrine" in reaching its decision in the underlying dispute.

We detect no abuse of discretion in the trial court's resolution of the dispute in this matter. We further conclude that the implied and express factual findings underlying the court's rulings are supported by substantial evidence. (See *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115-1116, fn. 6 [we presume the "trial court impliedly found 'every fact necessary to support its order' "].) Accordingly, we affirm the trial court's rulings.

Little Rock Ranch and the Johnsons had neighboring properties in Waterford; both properties were large. Little Rock's property exceeded 600 acres and was planted with walnut trees. The Johnsons' property exceeded 200 acres and was planted with almond trees. The trial court found Little Rock Ranch was trespassing, by encroachment, on a strip of the Johnsons' property, having physically leveled the land and integrated it into

the development of an irrigated walnut orchard on its own land. The disputed strip consisted of 3.44 acres and, prior to Little Rock's encroachment, was essentially barren. It had not been put to any significant use by the Johnsons in decades, nor was any significant future use contemplated by the Johnsons.

The court considered various factors in assessing the equities at issue. Little Rock had invested substantial time, resources, and acumen in developing the orchard. The proportionate cost of the improvements made to the largely barren strip exceeded $25,000. The court observed that, as result of considerable time, effort, and money expended by Little Rock Ranch, "the value of the property in dispute ha[d] been improved by the planting of walnut trees" and "[i]t's value [was] now greater than it was originally."

The court also considered the Johnsons' position: "The Plaintiffs have demanded that the [3.44] acres in dispute be restored to their original condition before Little Rock Ranch improved the property. In other words, the Plaintiffs wish to have the walnut trees and irrigation installed on the property removed and wish to have several thousand tons of dirt brought back to the property." The court inferred that undoing the improvements would cost substantially more than the cost of making them, because, inter alia, "the cost of transporting big caterpillars to the property would have to be spread over less than 4 acres, instead of 677 acres." In other words, because the entire orchard had been designed and developed as a whole, Little Rock generated economies of scale during the initial development. Undoing the improvements on the strip would not only be disproportionately more expensive, but would affect other aspects of the orchard, given its integrated design as reflected in, among other things, the irrigation system and the utilization of "soldier rows" of trees along its perimeter. The court concluded that the cost of restoring the property to its original condition, including the required earth-moving and reconstruction of a hillslope, would be "excessive."

The court further noted that "removing an estimated 400 18 to 24 foot tall walnut trees" and "removing all of the irrigation piping and micro sprinklers" would be economically wasteful, in that the cost would outweigh the value of the land in an unimproved state.[5] The court observed that were the trees and irrigation system to be ripped out, the land would "become a dry, barren 'patch' of land, in the midst of beautiful orchards on either side of it," and its value would drop from "$35,000 per acre to roughly $8,000 per acre."

The trial court found that while Greer committed the trespass, he (1) had operated on the understanding that his property extended to the barbed-wire fence, and (2) had taken multiple steps towards designing and developing his walnut orchard before the Johnsons made any move to inform him that the fence line was not the property line. The court made findings of fact to the effect that Jim Booth, Little Rock Ranch's realtor, was told by Albert Roen that the Roen property extended all the way to the fence to the south, and that Booth, in turn, told Greer that the southern boundary of the Roen property was marked by the barbed-wire fence. The court also found Greer did not properly read the relevant contents of the preliminary title report that generally noted the fence line encroached onto adjoining land in multiple areas.[6] Finally, the court found that, by the time the Johnsons complained to Greer about Little Rock's encroachment on to their

---

[5] The court noted the law did not "sanction economic waste" and mentioned "the doctrine of economic waste." Plaintiffs question the applicability of the doctrine of economic waste in the present context. However, as a general principle, "[e]quity abhors wanton waste." (*Gammon v. McKevitt* (1920) 50 Cal.App. 656, 665.)

[6] Greer testified that he undertook a cursory review of the preliminary title report. Furthermore, Greer understood, based on a conversation he had previously had with Booth, that while there was a potential, in the case of large agricultural properties, for minor discrepancies between property lines and fence lines, any such discrepancies would be de minimis, that is, limited to a foot or two and to some spots. Therefore, the relevant general notation in the preliminary title report would not necessarily have tipped him off as to the existence of the boundary dispute underlying this case.

property, Greer had completed leveling and earth-moving work on the entirety of the property he believed was his (including the disputed property) and had "already ordered and paid for irrigation systems and specially budded walnut trees" for the same acreage.

As for detriments suffered by the Johnsons on account of the trespass, the trespass interfered with the Johnsons' ability to use the disputed strip however they desired and, more specifically, the opportunity to use it for occasional hunting of squirrels and rodents (which represented their usual use). After balancing the equities and hardships applicable to each side, the court denied the Johnsons' request for an injunction to end Little Rock Ranch's trespass. (See *Dolske*, *supra*, 58 Cal.2d at p. 520 [in applying the relative hardship doctrine, the court considers, inter alia, the "proportionate hardships to the parties"].) In reaching its decision, the court also relied on the test articulated in *Brown Derby Hollywood Corp. v. Hatton* (1964) 61 Cal.2d 855, 858 [" '[W]here the encroachment does not irreparably injure the plaintiff, was innocently made, and where the cost of removal would be great compared to the inconvenience caused plaintiff by the continuance of the encroachment, the equity court may, in its discretion, deny the injunction and compel the plaintiff to accept damages.' "].)

In light of evidence that excavations undertaken by Little Rock on the disputed property created the potential for erosion of a dirt road (running alongside the fence) on the Johnsons' property, the court ordered Little Rock to prepare and execute a "remedial plan, prepared by a licensed soils engineer or environmental consultant," subject to monitoring by the court. The court also awarded damages to the Johnsons.

The court's ruling finds support in case law, including *Hirshfield* and *Dolske*. In *Hirshfield*, *supra*, 91 Cal.App.4th 749, defendants encroached onto plaintiffs' neighboring property with a masonry wall, a putting green, a sand trap, and waterfalls. The trial court denied the plaintiffs' request for an injunction compelling the removal of the defendants' encroachments onto the plaintiffs' property. The Court of Appeal affirmed because the costs of removing the encroachments outweighed the limited value

28.

of the affected property to the plaintiffs. In *Dolske*, *supra*, 58 Cal.2d at p. 520, the California Supreme Court held the trial court erroneously ordered the removal of disputed encroachments instead of awarding money damages, "where said encroachments are causing little or nominal damage … and the cost of their removal would be proportionately great."

Plaintiffs rely on *Salazar*, *supra*, 245 Cal.App.4th 634, a case involving encroachment by the defendant onto the plaintiffs' neighboring property, by making a road and erecting a gate on the latter property, cutting down trees thereon, and diverting water from it through pipes and culverts. (*Id*. at pp. 638-641.) The *Salazar* court concluded the trial court there did not abuse its discretion in granting injunctive relief to plaintiffs and fashioning an equitable remedy in favor of plaintiffs that was tailored to the factual circumstances of that case. (*Id*. at pp. 647-649.) However, *Salazar* is distinguishable on the facts in many respects. In particular, in *Salazar*, "there was ample evidence that [the] defendant's encroachment onto [the] plaintiffs' land was intentional," and was undertaken to take advantage of the flatter, more level grade of the plaintiffs' land to make a road, and to tap into a spring on plaintiffs' land in order to grow marijuana on his own plot (which lacked a water source). (*Id*. at pp. 639-640, 642, 649.) In the instant matter, by contrast, Greer and Little Rock Ranch undertook earth-moving work, ordered specially budded trees, and had an integrated irrigation system designed, all in the belief that the fence represented the boundary between the Roen and Johnson properties. Furthermore, in *Salazar*, in contrast with the present case, the plaintiffs presented relatively detailed evidence of a remediation plan and restoration costs. (*Id*. at pp. 641-642, 648-649.)

Relying on *Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020—a case with far simpler facts and that is distinguishable on the facts—the dissent contends that equitable relief was not warranted here. The dissent suggests that Greer was negligent in not properly reading the preliminary title report, which contained a general

29.

notation to the effect that the "the fence line encroaches onto adjoining land in multiple areas," but did not specify the extent of divergence between the fence line and the property line. The dissent posits that since Greer was negligent, Little Rock Ranch cannot be considered an innocent encroacher, thereby precluding equitable relief in its favor. However, the trial court specifically faulted Booth, Little Rock Ranch's real estate agent, for not explaining to Greer the contradictions between, on the one hand, the seller's vacant land questionnaire (which was completed by the Roens and indicated the Roens were not using any neighboring property), and on the other hand, the preliminary title report (which indicated the fence line did not perfectly align with the property line). Moreover, there was evidence indicating that Greer understood, based on a conversation he had previously had with Booth, that while there was a potential, in the case of large agricultural properties, for minor discrepancies between property lines and fence lines, any such discrepancies would be de minimis, that is, limited to a foot or two and to some spots. Accordingly, the general notation in the preliminary title report to the effect the fence line encroached, in places, onto adjoining property, would not necessarily have alerted Greer to the facts underlying the instant dispute.

The court also considered the fact that Greer was assured by Booth that the Roen property extended to the fence line, which fact, together with Greer's understanding that any potential divergence between the fence line and the property line would be limited to a foot or two, in some spots, undercut the value of the aforementioned notation in the preliminary title report for purposes of alerting Greer to the facts underlying the instant dispute. Finally, the court considered the fact that, in undertaking extensive and expensive earth-moving work, designing and ordering an irrigation system, and ordering specially budded trees (that were not marketable), Greer relied on Booth's assurance that the Roen property extended to the fence line. The court's express and implied findings underlying its conclusion that Greer did not willfully or negligently cause the encroachment at issue, are supported by substantial evidence, and the court's conclusion

30.

in this regard was not an abuse of discretion.  (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 1004 [" 'The question whether the defendant's conduct is so egregious as to be willful or whether the quantum of the defendant's negligence is so great as to justify an injunction is a matter best left to the sound discretion of the trial court.' "].)  Nor can it be said here, given the highly complex factual situation at issue and the necessity of a site visit on the part of the trial court, that Greer acted negligently as a matter of law, so as to categorically preclude the granting of equitable relief.

Given the applicable law and relevant facts, we conclude the court's resolution of the disputed issues, including its denial of injunctive relief and formulation of an alternative, equitable remedy, does not represent an abuse of discretion.

### (3) Court Properly Found Little Rock's Trespass Was Permanent Such That "Diminution in Value" Damages Were Appropriate

The court also concluded that Little Rock Ranch's trespass on the Johnsons' property was permanent, such that an award of damages based on the diminution in value of plaintiffs' overall property in light of the loss of the disputed property, rather than injunctive relief or damages pursuant to Civil Code section 3334, was the appropriate remedy.  We detect no error in the court's rulings.

### (a) Applicable Law

In determining whether injunctive relief and/or a damages award is an appropriate remedy and in identifying the proper measure of damages, courts consider whether the underlying trespass is permanent or can be abated.  The law regarding private nuisances is also instructive in this context.  (See *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1136 (*Mangini*) ["California cases have … recognized that invasions of … property, otherwise amounting to a trespass, may also constitute a nuisance"]; *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal.App.4th 583, 594 (*Starrh & Starrh* ["generally the principles governing the permanent or continuing nature

31.

of a trespass or nuisance are the same and the cases discuss the two causes of action without distinction"].)

In determining whether the trespass or nuisance is abatable, courts may consider " '[w]hether (1) the offense activity is currently continuing, which indicates that the [trespass or] nuisance is continuing, (2) the impact of the condition will vary over time, indicating a continuing [trespass or] nuisance, or (3) the [trespass or] nuisance can be abated at any time, in a reasonable manner and for reasonable cost, and [whether such abatement] is feasible by comparison of the benefits and detriments to be gained by abatement.' " (*Starrh & Starrh*, *supra*, 153 Cal.App.4th at pp. 594, 599 ["Technical feasibility does not necessarily prove abatability."]; see *Mangini*, *supra*, 230 Cal.App.3d at p. 1146 ["the crucial distinction between a permanent and continuing [trespass or] nuisance is whether the [trespass or] nuisance may be discontinued or abated"; "a continuing nuisance is one that may be discontinued at any time"]; *Beck Development Co. v. Southern Pacific Transportation Co*. (1996) 44 Cal.App.4th 1160, 1217 (*Beck*) ["[t]here is no short and all-inclusive rule for distinguishing between permanent and continuing nuisances"; rather, any of various " 'tests' emphasizing different factors which may be considered"—ultimately, each "case must be determined upon its own peculiar circumstances"].)

*Beck* addressed various tests for assessing whether a trespass or nuisance is continuing or permanent. One test, for example, is the "continuing activity"/"permanent encroachment" test. *Beck* explained that, depending on the circumstances, it may be useful to consider whether the alleged injury can be abated simply by discontinuing an ongoing use of the land or whether the injury arose on account of the location of the defendant's structures (an encroachment). (*Beck*, *supra*, 44 Cal.App.4th at p. 1218.) *Beck* noted that while generally there would appear to be a distinction between a continuing activity and a permanent encroachment, under some circumstances it is hard to draw this distinction. A nuisance arising from a continuing activity is generally seen

32.

as having, as a "salient feature," an impact that varies over time and gradually increases, rather than effects that are "relatively static." (*Ibid*.)

Beck also addressed another often-used test, "that is, whether the nuisance can be abated at any time." (*Beck*, *supra*, 44 Cal.App.4th at p. 1219.) *Beck* explained that "[t]he abatability test, phrased as whether the nuisance can be abated at any time, is stated in such broad terms that, standing alone, it does not convey much information." (*Id*. at p. 1220.) *Beck* observed: "Accordingly, 'the discontinued-or-abated rubric should be regarded as no more than a convenient shorthand for the fundamental considerations' that must enter into the determination." (*Id*. at p. 1220.) "These considerations include such things as the feasible means of, and alternatives to, abatement, the time and expense involved, legitimate competing interests, and the benefits and detriments to be gained by abatement or suffered if abatement is denied." (*Ibid*.) *Beck* emphasized, "there is no single overriding test for determination whether a nuisance is permanent or continuing," and "[t]he determination must be made on the facts and circumstances of each case with guidance from the various tests that have been set forth." (*Id*. at p. 1222.)

The nature of the trespass— i.e., whether it is permanent or continuing—affects the proper measure of damages. For example, when a trespass is continuing, a permanent measure of damages is not an appropriate choice, as future harm is not ascertainable to a certainty. (See *Starrh & Starrh*, *supra*, 153 Cal.App.4th at pp. 592, 598 [the distinction between a continuing trespass and a permanent trespass is relevant to determining the correct measure of damages; if the trespass will continue into the future because abatement is *not* feasible, then damages can be fully ascertained, and full recovery is available to the plaintiff for all harm suffered]; see also *Beck*, *supra*, 44 Cal.App.4th at p. 1216 ["In an action on a permanent nuisance, the plaintiff will be permitted to recover both past and prospective damages while in an action on a continuing nuisance prospective damages are unavailable and recovery is limited to actual injury suffered prior to commencement of each action."]; *Spaulding v. Cameron* (1952) 38 Cal.2d 265,

33.

267 ["some types of nuisances should be considered permanent, and in such cases recovery of past and anticipated future damages [are] allowed in one action"].) In fact, the question of characterization of a trespass as continuing or permanent "is related to the damages suffered." (*Starrh & Starrh*, *supra*, at p. 598 ["the question of whether a trespass is continuing or permanent is ultimately a damages question"]; see *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 937 [whether trespass is continuing or permanent depends on the type of harm suffered].) In short, there is an interplay between the nature of the trespass or nuisance (i.e., whether it is continuing or permanent) and the damages suffered.

"Pursuant to Civil Code section 3334, damages allowed for *continuing* trespass include the value of the use of the property, reasonable cost of repair or restoration to the property's original condition, and the costs of recovering possession."[7] (*Starrh & Starrh*, *supra*, 153 Cal.App.4th at p. 592, italics added.) However, "general principles of damages in trespass cases require that the damages bear a *reasonable* relationship to the harm caused by the trespass." (*Id.* at p. 601.) " '[T]he general rule is that if the cost of repairing the injury and restoring the premises to their original condition amounts to less than the diminution in value of the property, such cost is the proper measure of damages; and if the cost of restoration will exceed such diminution in value, then the diminution in value of the property is the proper measure.' " (*Id.* at pp. 588, 602 ["[D]iminution in value may be a legitimate measure of damages where restoration costs are unreasonable."].)

Thus, if restoration of the property encroached upon is not possible or is economically impractical, then statutory damages for such restoration costs are not available pursuant to Civil Code section 3334; rather, diminution in value damages may

---

[7]    "Continuing trespasses are essentially a series of successive injuries.… In order to recover for all harm inflicted by a continuing trespass, the plaintiff is required to bring periodic successive actions." (*Starrh & Starrh*, *supra*, 153 Cal.App.4th at p. 592.)

be recovered. (*Starrh & Starrh*, *supra*, 153 Cal.App.4th at p. 599.) Simply put, under *Starrh & Starrh*, "when the cost of abatement is not reasonable, these costs cannot be recovered under either Civil Code section 3334 or [any other theory]." (*Id.* at p. 600.) *Starrh & Starrh* further explained that "restoration cost is a statutorily authorized economic damage which must rest on specific evidence or be reached by a mathematical manipulation of the evidence presented." (*Ibid.*)

"In any trespass case, the proper measure of damages is the one that will fully compensate the plaintiff for damages that have occurred or can with certainty be expected to occur." (*Starrh & Starrh*, *supra*, 153 Cal.App.4th at p. 599.) Courts retain flexibility in identifying and applying a theory of damages that is appropriate to the circumstances at issue. (*Id.* at p. 604 ["Trial courts in trespass actions have historically been given great flexibility to award damages that fit the particular facts of the case."]; *Givens v. Markall* (1942) 51 Cal.App.2d 374, 379, 380 [whatever rule is best suited to determine amount of loss in particular case should be adopted]; *Basin Oil Co. v. Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 606 [there are many ways to measure damages for wrongful occupation of property and courts must be flexible and choose measure allowing full recovery as appropriate to circumstances]; *Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1785 [each case must be determined on its facts applying rule best suited to determine amount of loss].)

### (b) Analysis

As noted, the trial court concluded that Little Rock Ranch's excavation of the Johnsons' hillside and encroachment thereon constituted a permanent trespass. In this respect, the court stated: "Unless the Court orders the ripping out of the walnut trees, now 15 to 20 feet high, and producing walnuts, as well as the drip irrigation system, the trespass [by defendant] has to be considered as a permanent trespass."

The case law supports the court's conclusion that Little Rock Ranch's excavation of the Johnsons' hillside and encroachment thereon by planting walnut trees and laying

irrigation lines, amounted to a permanent trespass. *Bertram v. Orlando* (1951) 102 Cal.App.2d 506, 508, indicates that a permanent encroachment is " 'one which may not be readily remedied, removed, or abated at a reasonable expense or one of a durable character evidently intended to last indefinitely, costing as much to alter as to build it in the first instance, while, if the structure causing injury can easily be changed or repaired at reasonable expense, it is a temporary structure." (See *Field-Escandon v. DeMann* (1988) 204 Cal.App.3d 228, 233-243 ["the courts have held that the encroachment of buildings, walls, foundations, pipes and vents erected on another's property [citation], and railroad tracks [citation,] are permanent in nature"].)

Little Rock's trespass involved excavating and leveling a hillside on the plaintiffs' property, planting approximately 400 specialty walnut trees, and laying down an irrigation system. The court could properly find that Little Rock Ranch's structural changes, infrastructure development, and investment in trees were intended to be permanent and were not readily abatable (the court noted that restoration costs would be "excessive"). (See *Starrh & Starrh*, *supra*, 153 Cal.App.4th at p. 592 ["A permanent trespass is an intrusion on property under circumstances that indicate an intention that the [changes in use of the property] shall be permanent."].) The changes and improvements could not simply be discontinued on a dime and their impacts were relatively stable, rather than varying over time. The Johnsons contend the trespass was continuing. However, "[a] plaintiff cannot simply allege that a nuisance is continuing … but must present evidence that under the circumstances the nuisance may properly be considered continuing rather than permanent." (See *Beck*, *supra*, 44 Cal.App.4th at p. 1217.) Moreover, "[i]t is only where the evidence would reasonably support either classification that the plaintiff may choose which course to pursue." (*Ibid*.) The Johnsons' contentions in this context are not persuasive.

Since the trespass was permanent, the court concluded the Johnsons were entitled to damages based on the "the decrease in market value" of their property. (See

*Spaulding v. Cameron, supra,* 38 Cal.2d at p. 270 [where the trespass or nuisance is permanent, damages for the decrease in market value of the affected property are appropriate].)  More specifically, the court stated that "the appropriate compensatory damages" for the Johnsons being deprived of the 3.44 acres of their property was the diminution in the market value of their overall property on account of the loss of 3.44 acres.  The court elected to calculate the compensatory damages based on the "present value" of the land, that is, $35,000 per acre, instead of "the value of undeveloped farm land in that area," that is, $8,000 per acre.  The court thus awarded damages in the amount of 3.44 acres x $35,000, for a total of $120,400.

The Johnsons argue that Civil Code section 3334 "provides the applicable damage remedy."  Civil Code section 3334 provides:

> "(a) The detriment caused by the wrongful occupation of real property … is deemed to include the value of the use of the property for the time of that wrongful occupation, not exceeding five years next preceding the commencement of the action or proceeding to enforce the right to damages, the reasonable cost of repair or restoration of the property to its original condition, and the costs, if any, of recovering the possession.

> "(b)(1) Except as provided in paragraph (2), for purposes of subdivision (a), the value of the use of the property shall be the greater of the reasonable rental value of that property or the benefits obtained by the person wrongfully occupying the property by reason of that wrongful occupation.

> "(2) If a wrongful occupation of real property subject to this section is the result of a mistake of fact of the wrongful occupier, the value of the use of the property, for purposes of subdivision (a), shall be the reasonable rental value of the property."

The Johnsons contend that pursuant to Civil Code section 3334, they are entitled to an award of costs of restoration of the disputed property, the economic benefits received by Little Rock Ranch, and the costs of regaining possession.  However, as discussed above, here the court concluded the trespass was permanent, in part because the cost of restoring the property to its original condition, including the required earth-

37.

moving and reconstruction of a hillside, would be "excessive." In light of these determinations, damages under Civil Code section 3334 were not available to plaintiffs. (See *Starrh & Starrh*, *supra*, 153 Cal.App.4th at p. 599 [if restoration of the property encroached upon is not possible or is economically impractical, then statutory damages for such restoration costs are not available pursuant to Civ. Code, § 3334; rather, diminution in value damages may be recovered].)

It should also be noted that the Johnsons—who sought the costs of restoration of the property to its original state, as damages pursuant to Civil Code section 3334—did not present specific, appropriate evidence as to the amount of these costs; moreover, the feasibility of restoring the disputed property to its original hillside form was very much in doubt on the present record. (See *Starrh & Starrh*, *supra*, 153 Cal.App.4th at p. 600 ["restoration cost is a statutorily authorized economic damage which must rest on specific evidence or be reached by a mathematical manipulation of the evidence presented"].)

Furthermore, the Johnsons contended, based on far-fetched calculations contained in their post-trial brief, that the economic benefit derived by Little Rock Ranch was "$2,306,500, less any costs of development," and that this figure was just one component of the total damages to which the Johnsons were entitled under Civil Code section 3334. Not only did the Johnsons not adduce appropriate evidence of damages under Civil Code section 3334, but the figures they propounded were wholly disproportionate to the value of the strip of land at issue (the evidence showed the value of the 3.44 acre disputed property was $8,000 per acre in its original condition and $35,000 per acre as developed by Little Rock Ranch).

As mentioned above, based on descriptive evidence in the record as well as its own observations of the relevant properties, the trial court ultimately concluded the cost of restoration would be "excessive." The court accordingly declined to award damages pursuant to Civil Code section 3334. The court determined that an appropriate award of damages would properly reflect the diminution in the market value of the Johnsons'

38.

property on account of the loss of 3.44 acres. (See *Starrh & Starrh*, *supra*, 153 Cal.App.4th at p. 588 ["diminution in value may be a legitimate measure of damages where restoration costs are unreasonable"].)

We detect no error in the court's decision to the effect the trespass was permanent and, in turn, to award damages based on the diminution in value of the Johnsons' property absent the 3.44 acres. (See *Starrh & Starrh*, *supra*, 153 Cal.App.4th at p. 604 ["there are many ways to measure damages for wrongful occupation of property and courts must be flexible and choose measures allowing full recovery as appropriate to circumstances"]; also see Civ. Code, § 3359 ["Damages must, in all cases, be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered."].)

The Johnsons further claim the court erred in not awarding additional damages for conversion of dirt excavated from their property. We see no merit in this claim. Addressing the Johnsons' claim for conversion damages, the trial court observed: "Plaintiffs seek to have Little Rock held responsible for the *separate* tort of conversion, for the removal of dirt from the [3.44] acres, and spread elsewhere over the 677 acres. They claim that the dirt was used to turn 60 plus acres of wetlands into productive farmland. However, the Court rejects this contention." The court explained that the Johnsons had not provided authorities to support their claim for conversion damages. The court added: "Secondly, if this were a case in which Little Rock had gone onto Plaintiffs' property, taken the dirt, and then retreated to its own property, Plaintiffs' claim for conversion might be valid. But here, it is not logical to attempt to separate out the dirt from the property. The fact is, Little Rock trespassed onto the property and still retains the property. There was no separate crop on the [3.44] acres. The dirt cannot be considered separately from the property itself." The court continued: "Third, there was no proof of where the dirt, removed by Little Rock, ended up. At least some of the dirt

39.

could have been removed from one portion of the [3.44] acres to another portion of the [3.44] acres."

The court concluded the Johnsons' theory of conversion damages—based on the value of over 60 acres of Little Rock Ranch's own property—amounted to a request for "astronomic damages," and denied the request.  Significantly, damages are an element of the tort of conversion, and are generally based on the value of the thing converted; at trial the Johnsons failed to present competent evidence as to the amount of dirt removed from the disputed property and the dirt's value.  (See *Greka Integrated, Inc. v. Lowrey* (2005) 133 Cal.App.4th 1572, 1581; Civ. Code, § 3336; CACI No. 2102.)  We detect no error in the court's analysis and ruling rejecting the Johnsons' theory of additional conversion damages.

### DISPOSITION

The judgment is affirmed.  Each party to bear its own costs.


                                                                      SMITH, J.

I CONCUR:


SNAUFFER, J.

40.

POOCHIGIAN, Acting P.J., dissenting,

The Johnson family has owned a 220-acre property for four generations. Its northern boundary is marked by iron pipes at the northeast and northwest corners. There is also a fence on the property that runs east to west about 50 feet south of the northern boundary.[1]

Between the fence and the boundary lies about 3.44 acres of land.[2] Roger Johnson testified that during the summer, they would park harvesters there. The Johnsons also occasionally hunted in this area and would sporadically throw down seed to "chum it." Overall, the Johnsons did not use this land often.

To the north of the Johnson property is a 677-acre property formerly owned by the Roen family. Albert Roen (Roen) showed his property to a realtor. Roen testified that he told the realtor about the correct boundary marker and that the fence was *not* on the property line. However, the trial court did not credit that testimony and found that Roen had incorrectly told the realtor that his property went to the fence on the Johnson property (rather than to the actual boundary demarcated at its ends by the iron pipes). The court found that the realtor conveyed this incorrect information to Raymond Greer, the principal of Little Rock, and a potential buyer of the Roen property.

---

[1] The majority characterizes this as the fence being in the "wrong" place. (Maj. opn., *ante*, at p. 21.) However, there is no requirement that landowners only place fences on property boundaries.

Moreover, it's not entirely clear who built the fence. Roen testified the fence surrounding *his* parcel – which apparently included the portion of fence in question here – had been built "probably" close to 1900. Thus, even if the fence was in the "wrong" place, it may have been Little Rock Ranch's (Little Rock) predecessor-in-interest who placed it there, rather than the Johnsons' predecessor-in-interest.

[2] Various acreage figures for the disputed area were used throughout the record. The parties stipulated that the area was "3.1 acres, more or less." The court's ruling used the figure of 3.9 acres. However, it appears the most accurate number is 3.44 acres. (See maj. opn., *ante*, p. 3, fn. 1.) That figure is used throughout this separate opinion.

1.

Roen accepted an offer from Greer to buy the Roen property, and escrow was opened. Fortunately, the preliminary title report did its job, observing that " 'the fence line encroaches onto adjoining land in multiple areas.' " Greer signed a document stating he received and approved the preliminary title report. However, Greer had in fact not read the report.

From March to May 2012, Little Rock conducted earthmoving operations on its own property and on the 3.44 acres between the Johnsons' fence and the actual property line. In November 2012, a lawyer contacted Greer by letter protesting the encroachment on the Johnsons' property. Nonetheless, Little Rock proceeded to plant walnut trees and install an irrigation system on the 3.44 acres *after* receiving the letter.[3] According to Greer, the previously ordered trees were not marketable because they were uniquely suitable to Little Rock's orchards.[4] (Maj opn., *ante*, at pp.7–9.)

Unsurprisingly, the trial court found Little Rock had encroached and trespassed on 3.44 acres of the Johnson property. The court nonetheless ordered that the Johnsons deed the 3.44 acres to Little Rock for $136,500.[5]

*Equitable Relief*

We faced a similar situation in *Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020 (*Hansen*).[6] In that case, the Hansens and Valovs owned adjoining

---

[3] Indeed, Greer specifically testified that he knew he was planting the trees on the Johnsons' property. Shortly thereafter, Greer testified that he at least knew it was a "possibility" he was planting and installing an irrigation system on the Johnsons' property, but he "took the chance" and planted the trees anyway.

[4] Greer testified that while the tree variety known as Tulare was grown elsewhere, the trees ordered by Little Rock had their rootstock budded to a "specific subvarietal." According to Greer, the specific subvarietal would not "readily move[] on the market." However, Greer did not even ask the nursery if they could resell the 500 trees Little Rock had ordered.

[5] The trial court's written ruling, and its willingness to conduct a site visit, reflect a thorough and thoughtful consideration of the issues presented.

[6] Though erroneously applied here, the law of equitable relief is not altered by today's opinion. The majority does not undermine or persuasively distinguish *Hansen*,

parcels. The Hansens had long used their parcel for farming. Respondent Erik Hansen's father told him there was a " 'lot line adjustment issue' " under which " 'there was a discrepancy in the line in what we [i.e., the Hansens] have been farming.' " (*Id.* at p. 1025.) The specifics of the " 'lot line adjustment issue' " became clear in the ensuing litigation: the Hansens had been farming on their own land *plus* about 10 acres of Valov's property.

In the spring of 2012, the Hansens installed a drip irrigation system and performed "deep ripping" of 160 acres – including the 10 acres on Valov's property. (*Hansen*, *supra*, 22 Cal.App.5th at p. 1026.) In June 2012, the Hansens planted pistachio trees on the 160 acres. (*Ibid*.)

Valov sold his property to appellant Sandridge Partners, L.P., and the sale closed in December 2012. The Hansens and Sandridge attempted to resolve the dispute concerning the 10 acres but were unable to do so.

Hansen and Sandridge sued each other. Sandridge's suit alleged causes of action for conversion, trespass, and quiet title. After a trial, the court fashioned equitable relief for the Hansens pursuant to *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749. The Hansens were permitted to continue farming the 10 acres of Sandridge's property but had to pay the fair market value of the unimproved land to Sandridge. (*Hansen*, *supra*, 22 Cal.App.5th at p. 1027.)[7]

We began our analysis by stating the applicable standard of review. "While the resolution of factual *disputes* is left to the trial court, appellate courts may determine whether the elements of an equitable easement have been established by the facts as a

which remains good law. The majority also affirms that encroachments must have been " ' " 'innocently made' " ' " to warrant denial of an injunction against the encroachment. (Maj. opn., *ante*, at p. 23, quoting *Salazar v. Matejcek* (2016) 245 Cal.App.4th 634; see also maj. opn., *ante*, at p. 28, citing *Brown Derby Hollywood Corp. v. Hatton* (1964) 61 Cal.2d 855, 858.)

[7] The Hansens' equitable relief would terminate upon certain conditions.

3.

matter of law.  [Citation.]"  (*Hansen*, *supra*, 22 Cal.App.5th at p. 1028.)  Doubtful cases are to be resolved in favor of the innocent landowner over the encroacher.  (*Ibid.*)

Applying this standard, we reversed the grant of equitable relief to the Hansens.[8]  We observed that an overarching principle animating the law in this area is that encroaching trespassers are wrongdoers.  (*Hansen*, *supra*, 22 Cal.App.5th at p. 1028.)  The "most important" manifestation of this principle is the absolute requirement that an encroacher not have acted negligently or willfully in causing the encroachment.  (*Id.* at pp. 1028–1029 & fn. 10; see also maj. opn., *ante*, at p. 23, citing *Salazar v. Matejcek*, *supra*, 245 Cal.App.4th at p. 649 [encroachment must have been " ' " 'innocently made' " ' "].)[9]

We concluded that, even assessing the evidence in favor of the judgment, the Hansens' encroachment was clearly negligent because they knew their boundary with the adjoining property was in need of a " 'lot line adjustment.' "  Nonetheless, they installed an irrigation system and planted trees across a broad swath of land without first determining the nature of the lot line issue.  (*Hansen*, *supra*, 22 Cal.App.5th at pp. 1029–1030.)

Similarly, the evidence presented here, even when viewed in favor of the judgment, clearly shows Greer was at least negligent in causing the encroachment.  A preliminary title report expressly notified Greer that the fence line encroached on the

---

[8] The other portion of the opinion dealt with a different issue: the Hansen's request for a prescriptive easement.  (See *Hansen*, *supra*, 22 Cal.App.5th at pp. 1032–1037.)

[9] The two other elements of equitable relief are (1) absence of irreparable injury to the burdened landowner and (2) the hardship to the encroacher is " 'greatly disproportionate' " to the hardship to the plaintiff caused by continuance of the encroachment.  (*Hansen*, *supra*, 22 Cal.App.5th at p. 1028.)  However, if *all three* elements are not present, the trial court lacks the discretion to grant equitable relief.  (*Ibid.* & *id.*, fn. 12.)  Thus, even if the majority and trial court correctly considered the relative hardships as required by the third element, equitable relief was unavailable here due to the encroacher's negligence under the first element.

4.

neighboring property.[10]  Greer did not read the report, yet signed a document stating he had.[11]  This is a rather straightforward example of how an encroachment can arise from negligence.  And even after being made aware of the "dispute" surrounding the 3.44 acres, Greer proceeded to plant the walnut trees and install an irrigation system.

The majority counters that Greer testified he undertook a cursory review of a preliminary title report and "understood" that any discrepancy between the fence and property "would be de minimis, that is, limited to a foot or two and to some spots."  (Maj. opn.*, ante*, at p. 28, fn. 6.)  Nonetheless, the fact remains that Greer planted trees and installed an irrigation system instead of determining the *actual* extent of the divergence.  And he did so on land that he *admittedly* knew possibly belonged to someone else.  If Greer had ascertained the actual extent of the discrepancy, he would have learned the divergence was not a "de minimis" one or two feet, but instead around *50* feet.

And even after it turned out his claimed "understanding" was wildly wrong – to the tune of 3.44 acres – Greer now asserts that the risk of error should fall on the Johnsons, innocent nonparties to the transaction involving Greer, Booth and Roen.  The fact that Greer did not *know* the actual extent of the divergence is "*precisely why* it was negligent to plant a permanent crop in the area without determining where the correct lot line was located."  (*Hansen*, *supra*, 22 Cal.App.5th at p. 1030.)  "Indeed, if that conduct does not constitute a negligent encroachment, it is hard to imagine what would."  (*Ibid.*)

"Moreover, a contrary rule would encourage trespassers who are aware of an unspecified boundary issue to quickly build or plant something that is difficult to remove, rather than act responsibly and learn more about the issue."  (*Hansen*, *supra*, 22

---

[10] Innocent in this context does not mean "correct."  If the preliminary title report had not put Greer on constructive notice of the issue, he would have likely been entitled to rely on representations of the seller/realtor and visual cues like the fence.

[11] It is not that Greer failed to read the preliminary title report "properly," (maj. opn., *ante*, at p. 30), he did not read the contents of the report at all.

Cal.App.5th at p. 1030.) That is exactly what occurred here. Greer himself testified that he knew it was a "possibility" he was planting and installing an irrigation system on the Johnsons' property, but he "took the chance" and did it anyway. In equity, such conduct "should not be condoned, and certainly not rewarded."[12] (*Ibid*.)

Because the encroachment here was not "innocent," the Johnsons were entitled to injunctive relief against Little Rock's trespass. (See *Salazar v. Matejcek*, *supra*, 245 Cal.App.4th at p. 649.)

*Laches*

The court held that the Johnsons' effort to obtain equitable relief was defeated by the doctrine of laches. "[L]aches is established by showing unreasonable delay in bringing the action and prejudice to defendant resulting from this delay [citations]." (*Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 14.) Only when the delay is unreasonable will laches apply. (See *Hahn v. Board of Education* (1988) 205 Cal.App.3d 744, 753.) "The party asserting laches bears the burden of production and proof on each element of the defense. [Citation.]" (*Highland Springs Conference & Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 282.)

Here, the court focused on the fact that Little Rock's earthwork on the property was completed by May 2012, yet the Johnsons' lawyer did not contact Greer until the end of November 2012. However, as the court acknowledged, the Johnsons are "absentee owners who only occasionally visited their property." They had leased the land to a

---

**12** The majority's response to the points raised in dissent is to note that Booth acted negligently in connection with the sale of land from Roen to Greer. (Maj. opn., *ante*, at p. 30.) However, as explained above, Greer was clearly negligent in causing the encroachment. The fact that Booth *also* acted negligently does not aid their position that the encroachment was " ' " 'innocently made.' " ' " (*Id*. at p. 23, quoting *Salazar v. Matejcek*, *supra*, 245 Cal.App.4th at p. 649.) Moreover, Booth was negligent in connection with the sale of land from Roen to Greer – a transaction to which the Johnsons were strangers and bore no responsibility.

farmer. While the lessee farmer "may" have been aware of the earthmoving activities, the Johnsons "did not discover it for almost 6 months."

The court conceded that "six months by itself might not be sufficient to trigger laches."[13] Nonetheless, the court added to the six months what it referred to as "at least 50 years" of "inaction." The court held that this combined time period displayed an "attitude of disinterest" and triggered laches.

However, laches applies to a delay in bringing suit. It is unclear how the Johnsons' "inaction" during the 50 years *before* Little Rock's trespass could constitute a delay in bringing suit for said trespass.

Nor is it relevant that the Roens used the 3.44 acres during the preceding decades, because they did so with the Johnsons' knowledge *and permission*. Allowing your neighbors (and, in this case, *family*) to use your property is not a "failure" to assert the rights attendant to property ownership. If anything, the granting of permission to use property is an expression of ownership. In any event, it is not grounds for laches.

Moreover, it is unclear what action the Johnsons were required to take during those 50 years. The Johnsons used the land for storing harvesters and hunting. It is true that this use was "occasional." However, there is no "use it or lose it" policy with respect to private land ownership.

The court did observe earlier in its ruling that the Johnsons "took no action whatsoever to move the fence to the proper boundary lines." However, there is no requirement to only have fences on the boundaries of one's property. The Johnsons were

---

[13] The trial court correctly used the performance of the earthwork as the beginning of the time period relevant to laches. That is when the Johnsons suffered an actionable wrong. The majority's laches analysis instead observes that the Johnsons "waited" until "nine months after escrow closed" to bring the boundary issue to the attention of Little Rock. (Maj. opn., *ante*, at p. 22.) However, when escrow closed, the Johnsons had suffered no wrong and had no cause of action. Since there was no lawsuit to file, there could be no delay in filing suit.

quite within their rights to maintain a fence on their property apart from the parcel boundary.

*Conclusion*

Ordering private landowners to sell their property against their will to a trespasser is a profound power. If it is to be used at all, it must be used sparingly. The facts of this case do not justify it. I respectfully dissent.

POOCHIGIAN, Acting P. J.

8.